ACCEPTED
15-25-00023-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
3/18/2025 8:22 AM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00023-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/18/2025 8:22:23 AM
CHRISTOPHER A. PRINE
Clerk

# IN THE FIFTEENTH COURT OF APPEALS
## AUSTIN, TEXAS

*State of Texas*,

**Appellant,**

**v.**

*Nonparty Patient No. 1, Nonparty Patient No. 2, Nonparty Patient No. 3, Nonparty Patient No. 4, Nonparty Patient No. 5, Nonparty Patient No. 6, Nonparty Patient No. 7, Nonparty Patient No. 8, Nonparty Patient No. 9, Nonparty Patient No. 10, and Nonparty Patient No. 11*,

**Appellees.**

On Appeal from the 95th Judicial District Court, Dallas County, Texas
Cause No. DC-25-01823, The Honorable Monica McCoy Purdy presiding

## REPLY IN SUPPORT OF APPELLEES' EMERGENCY MOTION TO STAY DISCOVERY PENDING INTERLOCUTORY APPEAL

The State's response underscores the need to stay discovery. The State intends for its interlocutory appeal to prevent the Nonparty Patients from obtaining protection from the State's subpoenas to the Hospital Systems (the only relief sought below). Unless this Court intervenes, the State insists production will begin on March 21, despite the Nonparty Patients' pending objections and privilege assertions below being automatically stayed by this appeal. That would improperly turn the State's jurisdictional *losses* below into a *de facto* *win* on the merits. This Court has

1

authority under Rules 29.3 and 52.10 to prevent that and preserve the status quo.

The State's aspersions against Nonparty Patients about "forum shopping" and creating a procedural quagmire are projections. The State brought its underlying suit against Dr. Lau in Collin County, when the underlying medical records it now says it needs to prove its case are in Dallas County. So, it had to serve subpoenas in Dallas County. The Nonparty Patients (many of whom live in Dallas County, and whose medical records are all maintained in Dallas County) lawfully sought protection in Dallas County from those subpoenas under Tex. R. Civ. P. 176.6(e). There is nothing unique about Rule 176.6(e)—like many similar rules in other jurisdictions it allows for a court where a subpoena is served to adjudicate a protective order governing production, while the trial court maintains jurisdiction over the trial.

Any quagmires that have arisen since are solely of the State's making. It has fought the Nonparty Patients' right to be heard in Dallas County at every turn, including by pressing the trial court to enter orders for production while the Nonparty Patients' motion for protection is pending, and filing the instant interlocutory appeal mid hearing to stay the Dallas County Court proceedings before a protective order could be entered that would allow productions to begin in Dallas County while protecting the Nonparty Patients' procedural and substantive rights.

At every turn, in Collin County, Dallas County, and here, the Nonparty Patients have consistently asked for two things: the same right as every Texan to

2

choose to challenge a subpoena in the county where it was served, and the same right as every Texan to have their motion for protection adjudicated before any productions begin. The State's ongoing opposition to the Nonparty Patients' assertion of those rights brings the instant dispute before this Court.

The State's opposition does not support denying the stay, as the State is wrong (1) that there is no emergency, (2) that no relief is necessary to preserve the status quo, (3) that the Nonparty Patients' requests are moot, and (4) that a stay of discovery under the subpoenas is not in the interest of justice. Put short, the State's arguments do not justify allowing productions to go forward during the automatic stay triggered by the State's interlocutory appeal when those productions would irreparably harm the Nonparty Patients and effectively deny the relief sought below.

**1. There is an emergency—the State is pressing for production of the Nonparty Patients' medical records under the challenged subpoenas beginning on March 21, despite the automatic stay below.**

The State egregiously misstates the posture of the cases below and ignores the emergency it created by pressing for production under its subpoenas while its interlocutory appeal has stayed Nonparty Patients' motion for protection.

The Nonparty Patients have neither requested nor received any protective order regarding the State's subpoenas to the Hospital Systems from the Collin County Court. During a hearing on *party discovery* in Collin County, that court directed the Nonparty Patients to confer with the State to see if they could reach an

3

agreement regarding the subpoenas to the Hospital Systems—without any waiver of the pending motion for protection in Dallas County. *See* Opp. App'x Ex. H at 96:7-13 ("I asked all parties who are present today to engage in a meet and confer related to discovery, and certainly the Court here today does not find that the engagement in that process waives or otherwise obviates anyone's arguments or defenses in connection with this cause."). The Collin County Court further admonished the participants not to make arguments like the State is making now:

> As well, the Court would make a judicial statement here today that to the extent that was argued in a different court, this Court would find that with disfavor given that I have expressly stated no one is arguing - - no one is waiving any arguments by virtue of participating in a substantive meet-and-confer process.

*Id.* at 96:8-13. The State ignoring that directive is disappointing but unsurprising.

Throughout the Collin County hearings, the Nonparty Patients maintained that they were in Collin County regarding party discovery and that the Dallas County Court had jurisdiction over the subpoenas and their motion for protection from them. Opp. App'x Ex. H at 74:14 ("Your Honor, for the nonparty patients, we think it would be a good idea to take a brief recess, but we would also note for the Court that, you know, the Dallas County district court has taken jurisdiction over subpoenas that have been issued to the hospital in this case. The nonparty patients challenged them there in accordance with the Texas Rules of Civil Procedure."), 92:6-13 ("So to the extent this is now carrying over into the subpoenas to the

4

hospital, you know, I would just want to state once again for the record that the Dallas County courts have already asserted jurisdiction over those, and that's, you know, not what we understood that we reached an agreement with. It's about the request to Dr. Lau about the materials that were in his custody and control."), 97:20-23 ("Subject to the Court's note that we're not waiving anything, including things in our Dallas County actions, there is nothing else for us to put on the record.").

The State's suggestion the Nonparty Patients reached an agreement on a "first tranche of records" during that meet and confer is false. The Nonparty Patients *did not* reach an agreement about productions under the subpoenas (including because there was no agreement regarding the standard for redactions and withholdings). The Collin County Court noted that on the record: "As it relates to the represented patients [the Nonparty Patients], we haven't been able to reach an agreement regarding the standard applicable to the ultimate review." App'x I at 72:1-73:9. The State swore in its *verified* pleas there was no such agreement, despite saying the opposite now. Opp. App'x Ex. M at 4 ("Represented Patients refused to agree to the final terms …. The Collin County Court ultimately entered a ruling directing the limited sequential production over the objections of Represented Patients.").

The Nonparty Patients further memorialized their disagreement with productions while the Dallas County action was pending in their Verified Expedited Motion to Stay Productions, filed in Collin County. Opp. App'x Ex. J ¶¶ 12-13. The

5

State mischaracterizes that filing as a motion for protection from the subpoenas—but it plainly only seeks a stay of productions until the Dallas County Court can hear the pending motion for protection. *Id.* ¶ 1 ("The Nonparty Patients therefore must seek a stay of production from the Hospital Systems here so that (as promised under Texas Law) their request for protection in Dallas County can be adjudicated before the Hospital Systems make any productions, beyond the limited venue discovery already ordered."). The State is entitled to its own arguments, not its own facts.

Put simply, at every turn, and in every forum, the Nonparty Patients have asked for the same thing: to have their motion for protection heard in Dallas County before any productions begin under the subpoenas. The State's attempt to mischaracterize the record changes neither that nor the simple fact that the State made its jurisdictional arguments below, lost, and then filed this interlocutory appeal before the merits of the Nonparty Patients' motion could be heard. As a result, any productions under the subpoenas should be stayed to maintain the status quo.

And to be clear, the status quo is in danger. An emergency exists. As the State admits, the Collin County Court is poised to order productions of the Nonparty Patients' medical records as soon as this Friday, March 21. Absent an order from this Court clarifying that the subpoenas below are stayed with the Nonparty Patients' motion for protection, their privileged medical records will be produced without their objections and privilege assertions having ever been heard by any court.

6

**2. A stay of discovery under the subpoenas to the Hospital Systems is necessary to preserve the status quo.**

The State's argument that maintaining the status quo requires *producing* the Nonparty Patient's medical records is plainly wrong. As of now—and as of the State's notice of appeal—the Hospital Systems have produced no medical records requested under the State's subpoenas.[1] Maintaining the status quo thus means staying production under the subpoenas so that does not happen.

As the Texas Supreme Court has explained, the status quo "is the 'last, actual, peaceable non-contested status which preceded the pending controversy.'" *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016) (quoting *In re Newton*, 146 S.W.3d 648, 651) (Tex. 2004)). This controversy concerns the breadth of the subpoenas served on the Hospital Systems and the application of the physician-patient and mental-health privileges. The last peaceable state of affairs preceding the subpoenas was the *retention* of the Nonparty Patients' documents by the Hospital Systems. That is the proper framing of the state of affairs that must be preserved through a stay. *See, e.g.*, *In re Creuzot*, 2024 WL 4784362, at *3 (Tex. App.—Dallas Nov. 14, 2024, no pet.) (granting stay of discovery obligations pending resolution of a mandamus petition).

The State ultimately interrupted the proceedings below with its notice of

---

[1] Collin County *sua sponte* ordered production of limited, highly redacted jurisdictional discovery that was not requested in the subpoenas and is not at issue in Appellee's Motion or below.

7

appeal and prevented the Nonparty Patients' motion for protection from being heard. The status quo should be maintained as of that moment, a time when the Nonparty Patients' private and privileged medical records were indisputably unproduced.

**3. The Nonparty Patients' request is not moot—no court has adjudicated their asserted objections and privileges.**

The State is mistaken that the Nonparty Patients' Motion is moot. As explained above, the Collin County Court has never adjudicated the Nonparty Patients' request for protection. That request was, and is, only pending in Dallas County. The Collin County has never heard, much less adjudicated, the objections and privilege assertions pending in Dallas County. And the State's flawed suggestion that the Nonparty Patients are only entitled to protections entered (over their objections) in Collin County and not the full relief requested below steps squarely on the toes of the Dallas Count Court—a court that determined it had jurisdiction and was adjudicating the Nonparty Patients' motion before the State filed notice of the instant interlocutory appeal. Moreover, the State made the same arguments below about duplicative relief in Collin County in its pleas in abatement (Opp. App'x Ex. M at 1-5), and the Dallas County Court rejected them. It cannot simply *assume* reversal of its loss below to oppose maintaining the status quo on appeal.

While it is certainly true that some medical records will be produced in this case, the Nonparty Patients have lawfully and appropriately selected Dallas County as the forum for adjudicating the protective order that will govern those productions

8

and ensure the medical privacy guaranteed under Texas law. The State's bare suggestion that this Court is not empowered to enter a stay of discovery for the subpoenas being adjudicated by Dallas County below during the pendency of this interlocutory appeal is unsupported by any law. This Court has authority under Tex. R. App. P. 29.3 and Tex. R. App. P. 52.10 to enter orders that preserve the parties' rights and maintain the status quo. *See In re State*, 2024 WL 2983176, at *2 (Tex. June 14, 2024). The Nonparty Patients have no reason to doubt that the Collin County Court would respect this Court's order, despite the State's suggestions otherwise. But the suggestion a district court might ignore this Court's order does not render it moot—it suggests other relief may need to be sought if that happens, on the authority of the order that the Nonparty Patients are requesting.

**4. A stay of discovery under the subpoenas to the Hospital Systems is in the interest of justice—and necessary to prevent irreparable harm.**

The State is incorrect that the interests of justice counsel against a stay of discovery under the subpoenas. The State premises its position on a flawed belief that this Court should presume the lower court will be reversed, despite the State having not yet even filed its opening brief. Of course, the purported merits of the appellant's arguments (which lost below) do not warrant disturbing the status quo and permitting irreparable harm to the Appellees. But even more, the State is simply wrong on the merits because it misapprehends sovereign immunity.

Seeking protection under Tex. R. Civ. P. 176.6(e) does not require an explicit

9

waiver or abrogation of sovereign immunity, as the State suggests. By focusing on abrogation and waiver (here and below), the State ignores the antecedent question of whether sovereign immunity applies in the first instance in an action challenging a subpoena under Tex. R. Civ. P. 176.6(e). *See Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1,* 669 S.W.3d 178, 183 (Tex. 2023) ("Because sovereign immunity, and by extension governmental immunity, is first and foremost a common-law doctrine, we have recognized that the judiciary is responsible for defining the doctrine's boundaries and determining whether it applies in the first instance.") That is an initial question for the judiciary, not a subsequent question of legislative waiver or abrogation. *Id.*

As the Dallas County Court below correctly surmised, when (as here) the State voluntarily files a lawsuit, it submits to the rules of procedure, including the procedures for challenging its subpoenas. *See, e.g.*, *Anderson, Clayton & Co. v. State ex rel. Allred*, 62 S.W.2d 107, 110 (Comm'n App. 1933); *Sec. Tr. Co. of Austin v. Lipscomb Cnty.*, 180 S.W.2d 151, 159 (Tex. 1945); *State v. Zanco's Heirs*, 44 S.W. 527, 529 (Tex. Civ. App. 1898) ("When the state of Texas enters its courts as a litigant, it must be held subject to the same rules that govern other litigants"). This is accordingly not an action implicating sovereign immunity in the first instance. The inquiry thus never turns to waiver or abrogation.

The State's misunderstanding of the antecedent question is evident in its

misapplication of *Nazari v. State*, 561 S.W.3d 495, 501 (Tex. 2018) as suggesting that sovereign immunity is never abrogated in civil-enforcement actions. That case dealt with counterclaims for money damages, a type of case traditionally implicating sovereign immunity. *See id.* But in its most relevant part, *Nazari* confirms what the Nonparty Patients argued below and will argue here—by becoming a civil plaintiff, the State has submitted to the Texas Rules of Civil Procedure, including Rule 176.6(e), and the below action is not one that implicates sovereign immunity:

> Many of the cases the Providers cite stand simply for the proposition that *procedural rules apply to the state just as they would to any other litigant when the state appears in court*. That proposition, *though sound*, does not answer the question whether sovereign immunity protects the state from having to defend certain actions to begin with.

*Id.* (collecting cases that sovereign acting as litigant submits to procedures).

If anything, the relative weakness of the State's appeal highlights why the stay should be granted—without it, the Nonparty Patients will effectively have lost both their procedural rights (to be heard in Dallas County) and their substantive rights (to privileges under Tex. R. Evid. 509 and 510) because the State filed a facially weak interlocutory appeal and denied them a fair opportunity to be heard.

But the State's arguments on the merits are distractions at this stage. The question now is not on the merits but whether a stay of discovery under the subpoenas is necessary to maintain the status quo. For the reasons described above (and in the Motion) it is. The Court should thus grant the requested stay.

11

Dated: March 18, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

*/s/ William M. Logan*
William M. Logan
Texas Bar No. 24106214
wlogan@winston.com
Evan D. Lewis
Texas Bar No. 24116670
edlewis@winston.com
Olivia A. Wogon
Texas Bar No. 24137299
owogon@winston.com
800 Capitol Street, Suite 2400
Houston, TX 77002
Telephone: (713) 651-2600

Jervonne D. Newsome
Texas Bar No. 24094869
jnewsome@winston.com
Thanh D. Nguyen
Texas Bar No. 24126931
tdnguyen@winston.com
Jonathan Hung
Texas Bar No. 24143033
johung@winston.com
2121 N. Pearl St., 9th Floor
Dallas, TX 75201
Telephone: (214) 453-6500

**COUNSEL FOR APPELLEES**

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2025, an electronic copy of this Reply in Support of Appellee's Emergency Motion to Stay Pending Interlocutory Appeal was served to counsel of record for Appellants via electronic service in accordance with Rule 9.5 of the Texas Rules of Appellant Procedure.

*/s/ William M. Logan*
William M. Logan

# Appendix I

REPORTER'S RECORD

TRIAL COURT CAUSE NO. 493-07676-2024
TRIAL COURT CAUSE NO. 493-08026-2024

THE STATE OF TEXAS,             §  IN THE DISTRICT COURT
                                §
        Plaintiff,              §
                                §
VS.                             §
                                §  493RD JUDICIAL DISTRICT
MAY C. LAU, M.D.,               §
                                §
        Defendant.              §  COLLIN COUNTY, TEXAS


THE STATE OF TEXAS,             §  IN THE DISTRICT COURT
                                §
        Plaintiff,              §
                                §
VS.                             §
                                §  493RD JUDICIAL DISTRICT
                                §
M. BRETT COOPER, M.D.,          §
                                §
        Defendant.              §  COLLIN COUNTY, TEXAS


-----------------------------

MOTION HEARING

-----------------------------


     On the 28th day of February, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Christine Nowak, Judge presiding, held in McKinney, Collin County, Texas;

     Proceedings reported by machine shorthand.

A P P E A R A N C E S

FOR THE PLAINTIFF, THE STATE OF TEXAS:

    MS. ABIGAIL SMITH
    SBOT: #24141756
    OFFICE OF THE ATTORNEY GENERAL
    12221 Merit Drive
    Suite 650
    Dallas, Texas 75251
    Phone: 214-290-8830
    Abby.smith@oag.texas.gov

    MR. JOHNATHAN STONE
    SBOT: #24071779
    OFFICE OF THE ATTORNEY GENERAL
    PO Box 12548
    Austin, Texas 78711
    Phone: 512-936-2613
    Johnathan.Stone@oag.texas.gov

    MR. DAVID SHATTO
    SBOT: #24104114
    OFFICE OF THE ATTORNEY GENERAL
    PO Box 12548
    Austin, Texas 78711
    Phone: 512-936-2613
    David.shatto@oag.texas.gov

    MR. ROBERT FARQUHARSON
    SBOT: #24100550
    OFFICE OF THE ATTORNEY GENERAL
    PO Box 12548
    Austin, Texas 78711
    Phone: 512-936-2613
    David.shatto@oag.texas.gov

FOR THE DEFENDANT, MAY C. LAU, M.D.:

    MR. W. HENRY LEGG
    SBOT: #24116661
    STEPTOE, LLP
    717 Texas Street
    Suite 2800
    Houston, Texas 77002
    Phone: 713-221-2372
    Wlegg@steptoe.com

- AND -

MS. JULIE LOSCANO
BAR: #5873237
STEPTOE, LLP
1114 Avenue of the Americas
New York, New York 10036
Phone: 212-506-3900
Jlascano@steptoe.com


MR. ALEX WOLF
SBOT: #24095027
STEPTOE, LLP
717 Texas Street
Suite 2800
Houston, Texas 77002
Phone: 713-221-2300
Awolf@steptoe.com


MR. JOHN V. TREVINO, JR.
SBOT: #24003082
LEBOEUF LAW, PLLC
325 North Saint Paul Street
Suite 3400
Dallas, Texas 75201
Phone: 214-624-9803
Info@leboeuflaw.com


FOR THE DEFENDANT, M. BRETT COOPER, M.D.:

MS. ANIKA HOLLAND
CA Bar#336071
WILLKIE FARR & GALLAGHER, LLP
333 Bush Street
Floor 34
San Francisco, California 94104
Phone: 415-858-7411
Aholland@willkie.com

MS. SIMONA AGNOLUCCI
CA Bar#246943
WILLKIE FARR & GALLAGHER, LLP
333 Bush Street
Floor 34
San Francisco, California 94104
Phone: 415-858-7411
Sagnolucci@willkie.com

- AND -

MS. ISABELLA MCKINLEY CORBO
CA Bar#346226
Willkie Farr & Gallagher, LLP
333 Bush Street
Floor 34
San Francisco, California 94104
Phone: 415-858-7411
Icorbo@willkie.com

MS. ZOE PACKMAN
CA Bar#347453
Willkie Farr & Gallagher, LLP
333 Bush Street
Floor 34
San Francisco, California 94104
Phone: 415-858-7411
Zpackman@willkie.com

FOR THE NONPARTY PATIENTS:

MR. WILLIAM LOGAN
SBOT: #24106214
WINSTON & STRAWN, LLP
800 Capitol Street
Suite 2400
Houston, Texas 77002
713-651-2766
Wlogan@winston.com

FOR THE CHILDREN'S HEALTH NONPARTY PATIENTS:

MR. CORY M. SUTKER
SBOT: #24037569
COOPER & SCULLY, PC
900 Jackson Street
Suite 100
Dallas, Texas 75202
214-712-9500
Cory.sutker@cooperscully.com

MS. JACKIE COOPER
SBOT: #24050861
COOPER & SCULLY, PC
900 Jackson Street
Suite 100
Dallas, Texas 75202
214-712-9500
Jackie.Cooper@cooperscully.com

I N D E X

(MOTION HEARING)

2/28/25                                        Page  Vol

Appearances.................................... 2

Proceedings...................................  6
Discussions on discovery......................  9

Dr. Lau's Motion to Dismiss................... 34
State's Response.............................. 40
Dr. Lau's Response............................ 44
State's Response.............................. 49
Court's Ruling................................ 49

Dr. Cooper's Motion to Dismiss................ 50
State's Response.............................. 61
Dr. Cooper's Response......................... 65
Court's Ruling................................ 68

Further discussions on discovery.............. 71

Adjournment................................... 80

Reporter's Certificate........................ 81

P R O C E E D I N G S

THE COURT: All right, everybody. At this time we're going to be on the record. We are on the record this morning in connection with two different cause numbers. This is going to be Cause Number 493-07676-2024, the State of Texas versus Lau, and then also 493-08026-2024, the State of Texas versus Cooper. If I can go ahead and ask for appearances by the State at this time, all persons present.

MS. SMITH: Abby Smith for the State.

MR. FARQUHARSON: Rob Farquharson for the State.

MR. STONE: Johnathan Stone for the State.

MR. SHATTO: David Shatto for the State.

THE COURT: Thank you. All right. We're going to come over here. If I can have everyone for Dr. Lau.

MR. LEGG: Henry Legg for Dr. Lau.

MS. LOSCANO: Julie Loscano for Dr. Lau.

MR. WOLF: Alex Wolf for Dr. Lau.

THE COURT: Anybody else for Dr. Lau?

MR. TREVINO: John Trevino for Dr. Lau.

THE COURT: Thank you.

All right. Moving on to Dr. Cooper.

MS. HOLLAND: Anika Holland for Dr. Cooper.

MS. CORBO: Isabella McKinley Corbo for Dr. Cooper.

MS. AGNOLUCCI: Simona Agnolucci for Dr. Cooper.

MS. PACKMAN: Zoe Packman for Dr. Cooper.

THE COURT: Okay. Coming over here, nonparty patients.

MR. LOGAN: William Logan from Winston & Strawn on behalf of the nonparty patients, Your Honor.

THE COURT: Thank you. And then Children's Health, nonparty.

MR. SUTKER: Cory Sutker, Your Honor.

MS. COOPER: And Jackie Cooper, Your Honor.

THE COURT: Thank you. Okay. If there is anyone present who has not yet given my court reporter a card, you are hereby ordered to do so at this time so that she has the accurate spelling of everybody's names. So really, truly, if you haven't given her a card, in all seriousness, when we take our next break, please make sure you wander up here and give that to her so she doesn't have to struggle with all the spellings.

Okay. We were together previously on the 26th. We made a lot of headway. We're back here today on the 28th so that we can make additional progress. We have a couple groupings of motions to discuss here

today. One being motions related to discovery, another being related to ongoing publicity for the case, and then three, pending motions to dismiss.

When we were here at the last hearing, the Court said, hey, the last piece that was requested to be set was the publicity piece. If we get to that, we will; if not, then we'll have to reset for another day because, unfortunately, I have a drop-dead time for y'all.

Okay. The last time that we were together, we discussed -- I believe we had put on the record -- my court reporter says, hey, Judge, you talked about 27 but you never, in fact, put your ruling on the record, so I need to make sure I do that at this time.

The Court ruled that the prior hearing related to RFP No. 27 to Dr. Lau that "matter" should be redefined as "the lawsuit." "You" was defined to include both Dr. Lau and her attorneys. And so as a result of that, we were going to be producing communications from the time of filing to the present regarding the lawsuit, and again, being very clear, the Court in no way, shape, or form is condoning or ordering any production of privileged attorney-client communications. The State, you know, evinced their request and what type of communications they were

seeking with that and the Court ordered production as reformed.

Okay. Moving on from there. We took a recess so that we could get proposed language to amend the protective order related to what I've been calling "roll one." We are going to obviously more specifically define, but what we've been generally talking about in what I'm calling roll one discovery, is production of medical records for each of the patients named in the suits for only treatment by Dr. Lau and Dr. Cooper, January 1, 2022, to present.

I understand and fully hear from everybody, Judge, we're going to have to be more specific than that. I get it. I'm just generally stating kind of our general framework. We will come down and drill back a little bit more clearly in just a second, just I'm laying out where we are.

We also at our last hearing had discussed certain items that were going to be accomplished by today. So I'm going to go ahead and just memorialize on the record that we accomplished each of those.

So nonparty patient, you did provide your proposed revisions to the protective order to all of the parties, correct, nonparty patient?

MR. LOGAN: Yes, Your Honor, I did.

THE COURT: Okay. State, you did provide the list of six to ten patients as well as the test case identification; correct?

MR. SHATTO: Yes, Your Honor.

THE COURT: All right. Children's, you did bring with you today the test case documents, both the unredacted and the redacted; correct?

MR. SUTKER: Yes, Your Honor.

THE COURT: State, you provided the master key to Defendants in total, to Children's in total, and to the nonparty patients for those persons they represent; correct?

MR. SHATTO: Yes, Your Honor.

THE COURT: Okay. Lau, I omitted to ask this earlier. You said, Judge, it's going to be about 45 days until we get any production out the door. I said that's not going to cut it, bring me a better update. So what is our better update?

MR. WOLF: So, Your Honor, our better update is we are finishing collection. We anticipate that we will have everything collected by the end of next week based on our best estimate. It will take a few days of machine time to get that ingested. And then from there we will, of course, apply our search terms, obviously confirm with the State about search terms or

anything else like that, including the ESI protocol that might add a little bit of time to that. Then we -- like we mentioned last time, we plan on rolling production as we review. At this time I can't give a date certain when we will be done, but we are being diligent and are well on our way.

THE COURT: Okay. I have some concern regarding that report because of how long the requests have already been pending. So I do think we're going to need to tighten our time frame. Not related to medical records; right? Dr. Lau's got a lot of requests that are pending to her that are not related to the medical records, and so as it relates to those, I think we're still talking about too lengthy of a time frame before you're telling me you're contemplating making your first production. So when we take a break, again, we're going to talk about medical records separately, but I will be leaning on y'all.

I hear what you're saying, we're going to finish the collection by 3/7 and then apply search terms. We should be contemporaneously talking about search terms so that the second we get the collection and we process, we can apply those, not, okay, now we're ready to apply, let's talk about search terms. You know, we need to be doing some of these steps in tandem.

So when we take our next break, y'all need to have a conversation amongst your team related to that because I'm not going to be saying first production can happen 45 days from today's date, which is effectively what your timeline is contemplating. Okay.

MR. WOLF: Your Honor, and just to clarify, we do plan on starting rolling productions next week. So our first production wouldn't be 45 days.

THE COURT: Okay. And so when you say you're going to be proposing to make a first production next week, what would be included in that first grouping, do you think?

MR. WOLF: Your Honor, it would be documents that we have collected in communications from Dr. Lau. We anticipate we will be able do the initial production next week. And if there are broader search terms, it's possible that it will result in a larger universe of documents for us to review, but that will come out of our conversations with the State about ESI protocol and how search terms will work.

THE COURT: What is the volume of this expected first production? Do we have any concept at present? I mean, are we talking like, Judge, we're going to make our first production and it will be 15 pages, right, or is it, hey, Judge, we've got

communications and we're going to be turning over approximately 500 pages?  I'm trying to get a concept of volume.

MR. WOLF:  I think we'll be talking about a ballpark of hundreds of documents, but I don't have a good sense.

THE COURT:  Okay.  All right.  Y'all's homework is, on your next break, we're going to talk more concretely about what is our express schedule; what you think you're giving me, when; what search terms y'all would propose; what search terms, if any, y'all have communicated about.  I need a better idea of timeline because, given how long these requests have been pending, we're not going to be 45 days from now when we stream out our documents.  Okay.

I think those are all of the initial homework pieces.  So, during the break, I had an opportunity to meet with counsel for Children's Health who provided me the redacted and the unredacted documents related to the venue piece.  Okay.  So I had a chance to look at the test case documents.  Following the review and comparison of the redacted versus unredacted, I have directed slight modifications to unredact some additional fields.  And I'm happy to tell y'all the title of those fields.

The title was "Instructions." So related to the administration, after looking at it with Children's Health and the information the State specifically advised it had to have, I have directed unredacted information from the Instructions field; and then, as well, there is a field entitled "Frequency," which again talks about how frequently the medicine or testosterone should be administered, I have directed unredacting of that.

And my understanding at this time is that the nonparty patients have no objections to the Court's direction as it relates to that limited subset of unredactions, and so the Court is ordering the same framework to be applied to the remaining six to ten patients that the State has identified to Children's and that following that same framework being applied, that Children's Health has 14 days from today's date to provide the venue production to the parties.

And, nonparty patient, I know you wanted to put something on the record.

MR. LOGAN: Yes, Your Honor. We would just ask that the current protective order in this case be amended to, similarly as we have discussed about other potential tranches, addressed as venue discovery and what's being produced, the protections that are in

place, and that producing this venue discovery is not waiving anyone's rights to contest the other discovery requested.

THE COURT: So that the Court can maintain the production schedule, is there any opposition today to the Court orally amending the protective order to find that the discovery -- motion to transfer venue discovery that the Court is ordering being produced 14 days from today's date, that that discovery should be governed by the terms of the protective order, falls within its confines, and by not objecting to that discovery that the nonparty patients are not waiving any other objections?

MR. STONE: I think that's fine, Your Honor. We have one little request we would like to make to add to that. We would like the same that applies to Children's to also -- the same timeline to apply to UT Southwestern because, as we mentioned, the Plano office, which is in Collin County, those records are going to be in the possession of UT Southwestern, and they go directly to venue. So we would like the same language, but it will say Children's and UT Southwestern with the 14-day timeline.

THE COURT: So let me just ask defense counsel, do y'all have any objections to any of the

Court's statements or that proposal?

I'm seeing head shaking no but I need --

MS. HOLLAND: No objection.

MR. LEGG: No objection.

THE COURT: Okay. Children's obviously has no objection, so then the only other person would be the patients.

MR. LOGAN: I hate to be the squeaky wheel, Your Honor, but here's my concern. My concern is I haven't seen UT Southwestern here. I haven't seen how UT Southwestern would redact those documents if it was given to them. So I would like a similar opportunity to see their proposed redactions for a test patient to make sure that they comport with what the Court has in mind before we would agree that they just start producing documents.

THE COURT: So what if we do something a little bit different. I think everybody was acceptable with the Court doing an in camera inspection of a test case for UT Southwestern, so perhaps we approach it in that way. What I order UT Southwestern to do is not the wholesale production but to produce to the Court in camera review a redacted and unredacted set of a test case patient. I'll order the State to identify the test case patient, and then I'll give UT Southwestern 14 days

from today's date to give me that test patient.

I'll confirm, as I did today, that the redactions are identical in substance to the ones that have been made by Children's Health that you're comfortable with, and then after that review, if the Court is comfortable, then I would order that same production so that we are ensuring that we're consistent. Would you feel comfortable with us proceeding in that manner?

MR. LOGAN: Yes, Your Honor, with the same memorializations of the fact it doesn't affect our arguments in other forums or --

THE COURT: I think right here we're -- or do you agree to that?

MR. STONE: We agree. And we want Cooper Patient 14.

THE COURT: Okay. So we've identified test case at Cooper Patient 14. Okay. Just remember, y'all are going to be drafting these orders for me.

Okay. So Cooper Patient 14, I would propose that it might be a good idea for us to do one order to Children's Health and one order to UT Southwestern. The reason being is we -- I don't know whether UT Southwestern is going to assert any additional arguments. I can't foresee what might happen

with them. Since we have Children's present, I think it's probably best for us to do two separate orders and then that way we hundred percent have one that can go forward.

MR. STONE: Thank you, Your Honor. We'll draft that up.

THE COURT: Okay. And then is there any objection to the oral amendment of the protective order to make clear here today that all motions to venue transfer does not in any way waive any arguments that the nonparty patients have asserted elsewhere?

MR. STONE: We agree.

THE COURT: Agree?

MS. HOLLAND: Agreed.

MR. LEGG: Agreed, Your Honor.

THE COURT: All right. The Court orally amends the protective order. I would propose that if we're able to reach agreement on roll one and the revisions related to roll one, then we can then go in and formally make the written revisions, but I think for purposes of today, to keep the production on track, the oral amendment is sufficient.

Okay. As it relates to motions of venue language and the ruling on 27. Anything else we need to discuss before we turn to further talking about

discovery issues?

MR. LEGG: Your Honor, may I ask a clarification question about the ruling on RFP 27?

THE COURT: You may.

MR. LEGG: So you mentioned that privileged communications are not encompassed within the ruling. Our question is, we have had communications with Dr. Cooper's counsel as part of a --

THE COURT: Do y'all have a joint defense agreement?

MR. LEGG: We have a verbal allied litigant agreement, yes.

THE COURT: I think that the State might challenge a verbal allied agreement, but I don't know. And so certainly I think you can assert that privilege, and if the State wants to argue against its application, I can't prerule on privilege issues. So I mean, the Court is certainly very familiar with joint defense agreements. I've been part of many of them when I was in private practice. I have not currently researched whether or not oral versus written is sufficient, and I would leave that to whether or not the State would object. So I decline to prerule, but certainly I am aware that such a privilege exists.

MR. LEGG: Understood, Your Honor. And we

would also assert the work product protection would attach with respect to our communications, for example, with the -- and communications with the party -- the nonparty attorney.

THE COURT: So again, I think all I can say is you've got zero briefing before me related to the assertion of those privileges, and I'm not going to prerule on privileges. If you want to assert privileges in response to the discovery I've ordered to be produced, I'm certainly not taking away anybody's privilege objections -- or sorry, not objections because privileges are not objection, but privilege assertion.

But there's a proper procedure under Texas law for the assertion of privileges and it's similarly not ripe for the Court. I can't say, oh, you don't have produce, you know, so -- so follow the provisions that are set out in the Texas law for any of those privileges that you desire to assert, give the State their opportunity to evaluate and consider whether they want to file any motions or briefing related to that, and we'll go from there. I think that's the best guidance I can give you on that at this time.

MR. LEGG: Thank you, Your Honor.

MR. STONE: Your Honor, just one stipulation to that that will be helpful. So we

understand the allied litigant privilege, and we'll brief that up with you later. But as it relates to attorney work product, typically you don't do a privilege log when it comes to attorney product, but I think that might be helpful in this case because we're uncertain what the pool is here and it's going to be difficult to respond to attorney work product, I think, without a privilege log from them.

THE COURT: And so when we're on a break, y'all talk about that. I mean, my goal, obviously, is to protect items that should be protected. And I think the discussion y'all should have is, is it actually, while that particular piece may not be under the rules, is it going to behoove everyone to do it so that we do ensure that we're properly protecting everything, or is that going to be unduly burdensome. And frankly, I don't have the information y'all do regarding documents or what you want to assert, so I think y'all should talk collectively amongst your teams and then you can give me feedback after a break.

MR. FARQUHARSON: Judge, our position will be that joint defense was not -- was not raised when this was set. It is waived. And beyond that --

THE COURT: And again, I'm not going to prerule on this at this time. If they assert it and you

come back and say waived, I'll address waiver argument at that time.

MR. FARQUHARSON: We filed a motion to compel. My understanding is the Court has granted our motion to compel --

THE COURT: I have.

MR. FARQUHARSON: -- on Number 27, and therefore, their joint defense is waived at this point. We've also asked for a privilege log when we sent them a deficient letter and we have not received that. I believe that would be due today.

THE COURT: Y'all's response as to the timing of the privilege log.

MR. LEGG: Sure. Well, Your Honor, we would disagree about the waived argument. As you noted, this has not been briefed.

THE COURT: Well, I think what his assertion is is you didn't even -- in response to the objection, you would have had to have asserted attorney-client privilege joint defense and you didn't do that, and so to the extent -- I think that there is Texas case law regarding whether you -- when and how you can waive those privileges. Again, I'm a little flatfooted, so I feel uncomfortable saying one or the other. I prefer the parties to brief it. I don't have

the benefit like I did in federal court of having other folks to help me, it's just me, and I'm not able to address it at this time because I would be fearful that I would inaccurately state the status of the law.

MR. LEGG: Understood, Your Honor, and we would be happy to brief it. And we note, too, that it was not clear until the argument on Wednesday is our understanding that they were even seeking communications with Dr. Lau's counsel as part of the definition of with Dr. Lau. But with respect to the privilege log, Your Honor, I think we can provide that shortly after we have finished collecting the documents and reviewing the documents.

THE COURT: So I need a concrete timeline. The kind of nebulous "around about this time," we're just not going to -- not going to do it for today. So when we take a break, talk about here's the collection, here's when we can give the privilege log, and talk with the State about whether or not they're willing to accept that or not, and if they're not, then we'll argue it and the Court will make a decision. Okay?

MR. LEGG: Understood, Your Honor, with the proviso that some of that's going to be impacted by whether they're going to give us their proposed search terms and what that timetable is for applying those

search terms --

THE COURT: And I think I've already asked them to give you search terms.

MR. FARQUHARSON: Judge, I don't know if we want to hold this for other -- I don't know what comes next in terms of discovery but two things that I think would be helpful in light of our existing motion to compel. I think most -- the bulk of the details can be held off for later, but two things that are persistent throughout the discovery responses is hypothetical objections. And so if the Court could order that any objection has to have a good faith factual basis at the time it is made --

THE COURT: Can you point me to an example so that when you say that I have a more specific understanding.

MR. FARQUHARSON: Sure.

THE COURT: Counsel for nonparty patients, did you receive the proposed language?

MR. LOGAN: I did, Your Honor.

THE COURT: Okay. Can you be looking at that while we're having this discussion, please.

MS. HOLLAND: Your Honor, while they're looking for this specific discovery request and response, I would just like to chime in and say that

clearly the Court's order of production as to this RFP 27 in Dr. Lau's case would also implicate Dr. Cooper's, you know, assertion of privilege. We did not have the opportunity to assert that privilege on Wednesday because I did not understand the Court to be ordering production of attorney-client privileged material.

THE COURT: I am not ordering production of attorney-client privileged material.

MS. HOLLAND: Okay. I just want to make sure that we are preserving our assertion of privilege as to any communications between Dr. Lau's counsel and Dr. Cooper's counsel and have the opportunity to raise that further with the Court.

THE COURT: Well, I think that's a different issue. Communication between Dr. Cooper's counsel and Dr. Lau's counsel is a different issue than attorney-client privilege. Attorney-client privilege is you talking with Dr. Cooper.

MS. HOLLAND: You're correct, Your Honor. I misspoke. I meant the joint defense privilege issue.

THE COURT: And I'd have to look at your objections. I think their argument is just y'all didn't raise it.

MS. HOLLAND: And you don't have our

objections yet because --

THE COURT: So I'm just saying I don't know. I mean, I have told y'all. I don't know whether some oral agreement is sufficient under Texas case law. Certainly a written one is sufficient; it sounds like y'all don't have one of those. So I am flatfooted and unable to provide you an answer, and if I did so, I would probably be wrong, so I'm not going to do so.

Give me an example.

MR. FARQUHARSON: Examples would be at Request for Production Numbers 1 through 21. They asserted a HIPAA objection. They are here -- on Wednesday and today are saying they don't have medical records so -- and HIPAA would not be compliant.

THE COURT: Well, and to be clear, I think they have consistently said, hey, Judge, we feel like we have to assert all of the objections related to medical records because, while our client doesn't have possession, access, custody or control, if inadvertently -- I know you objected to my use of the word "accident" -- but inadvertently there is a page or two of records here, they think they are bound to still provide the HIPAA protections and that's why. If you want me to have them state on the record that they are doubling down on "I don't have possession, access,

custody, control, and any records in my possession are stray records," I think we can do that for sure.

MR. FARQUHARSON: I think Rule 193.2(c) expressly says, all objections must have a good faith factual basis at the time made and that responses can be amended if additional documents come into their possession.

THE COURT: Okay. So if there is a stray document, why would a HIPAA objection not be appropriate?

MR. FARQUHARSON: Number one, HIPAA is a privilege and -- yeah, so it would -- it's a privilege, but if they find the document, then they can assert the HIPAA privilege, but they can't just say -- because the problem is right now we're sort of playing this game of Battleship and we don't know what exists and what's being withheld because they haven't said we're withholding to this extent. They've just said --

THE COURT: So, Counsel for Dr. Lau, let me ask you. I mean, is the HIPAA assertion only as to the patient medical records?

MR. LEGG: It's anything that's covered by HIPAA. So, of course, the HIPAA medical records is a pretty simple one, but anything that would be protected health information. And we agree that there's certainly

good faith factual basis for that, legal basis too.

THE COURT: Can you just give me an understanding of what other records might be in your client's possession that would fall in that category?

MR. LEGG: This is a hypothetical.

THE COURT: No, no. So I think that's his point is it's a hypothetical. But go ahead and tell me the categories because I am trying to get an idea of what you think might be this universe.

MR. LEGG: So, Your Honor, for example, if Dr. Lau was communicating with the patient about the treatment she was providing to that patient, for example, in a message, that would be something that is arguably covered by HIPAA. Obviously we have a protective order in this case and we have noted in our responses that we will produce any documents in our possession, custody or control, if any, after resolution of patients' objections to the production of any of their patient identifying information. So there's clearly a good faith factual basis for those objections, Your Honor. I think even in our responses we state we will be producing documents, again, after resolution of the objections to the extent we have any.

MR. LOGAN: Your Honor, from the nonparty patients' table over here as well, we would note there

is a very serious concern, and that we did understand the Court was going -- and as the State just said, they were going to discuss their requests that they didn't relate to the patient records. If there is our patients' records inadvertently tied up in their e-mail, we certainly would expect that those would be subject to our objections, our privileges, the patients' (indiscernible) not the doctors' (indiscernible). So if we're getting into inadvertent --

THE COURT: So here's how I'm going to handle this, okay. Because you are saying it's hypothetical. They haven't even finished the collection --

MR. FARQUHARSON: HIPAA is only an example right now. I'm talking this is throughout the request for production.

THE COURT: Understood. So here's -- bear with me. This is what the Court is proposing to do. You told me you're going to finish collection by 3/7, okay. I am going to order y'all to amend your discovery responses, once you have the documents in your possession, to assert only those objections that are applicable to the actual universe of documents and then to supplement if that universe of documents -- because I think what their concern is is, hey, Judge, there's --

they're alleging for everything that could possibly be out there, not what they actually have. So I think we can alleviate that by ordering amended responses only as to the documents that are in your possession.

MR. FARQUHARSON: And if that could also include an order that they state the extent to which documents exist and they have but are being withheld pursuant to those objections.

THE COURT: I think that that's probably a reasonable request. Right?

MR. LEGG: Thank you, Your Honor.

MR. STONE: Your Honor, we would also ask that they amend their RFA and interrogatory response. I'll give you another concrete example. So we asked them, "To the extent you contend that you were prescribing puberty blockers or cross-sex hormones for a purpose other than what is prohibited by SB 14, state the factual basis for your contention." And they asserted a number of privileges and objections to it, but they assert specifically, for example, that it's privileged patient -- physician-patient information, and so they didn't respond to the rog. We'd also like them to respond to the interrogatories and request for admissions as well and provide complete responses in seven days, Your Honor.

MR. LOGAN: Your Honor, it sounds like they're trying to circumvent our motion for protection.

THE COURT: I want a chance, based upon that argument, to look at the rogs a little further. I ruled as it relates to the production, okay. And so any questions regarding the Court's ruling on the request for production and the direction for amended responses?

MR. LEGG: Your Honor, just a question. So we will complete our collection by next Friday as we noted. It would be helpful to have a sense of when we should provide the amendment --

THE COURT: But I think I need that information from y'all to be able to give you the date certain. So when we do the recess and I say, hey, you got to drill down further, I need a tighter time frame, you are going to give me that and then I will give you the date certain based on that.

MR. LEGG: Understood. And then we would just note with respect to the -- our interrogatory responses and our RFA responses, the vast majority of those --

THE COURT: And I said I'm going to look at those. So right now I'm not going to hear argument on it.

MR. LEGG: Understood.

THE COURT: Okay. We'll come back to that piece in a little bit. Okay.

As it relates to the RFPs, do you need any -- I know you're going to the conference room.

MR. SUTKER: I am.

THE COURT: Yeah. Do you need any clarification on my ruling on the RFPs as it relates to Dr. Lau?

MR. LEGG: No, Your Honor.

THE COURT: Okay. So I think that covers everything that we need there. Does anybody need a bathroom break? Okay. We're going to take a five-minute bathroom break. Everybody run to the bathroom and then we'll be back on the record after that. Okay?

(Recess taken)

THE COURT: All right, everybody. We are back on the record. We're going to take just a bit of a break from our discovery issues so that we can see if we can make further agreements. We're going to turn at this time to the motions to dismiss. Pending before the Court are Lau's motion to dismiss and Cooper's motion to dismiss. We're going to take up the Lau MTD first. I'm going to hear arguments from counsel for Dr. Lau, counsel for State in response to that.

Once we've had an opportunity to fully argue Dr. Lau's motion, we'll argue Dr. Cooper's motion. The motions to dismiss actually do not overlay very much. The arguments asserted by Dr. Lau are very different from those asserted by Dr. Cooper and there have been no joinders filed, and so as a result, the Court thinks it's proper for us to take it up in that manner.

The Court's understanding of the arguments made by Dr. Lau, the MTD as it relates SB 14 is applicable to 16 patients, Patients 6 through 21. The State argues, as it relates to those patients, the prescriptions were written prior to the effective date, and so because of that there can be no violation of SB 14. As well, Lau moves for dismissal of all the DTPA claims. There are various arguments that are advanced as to the exceptions including, for example, that the DTPA protects consumers, and insurers are not consumers. So there's various arguments in connection with the DTPA.

The State's response predominantly is that each of Lau's arguments are, in fact, evidentiary in nature and that if we look to the text in Rule 91, if you will bear with me just for a second, 91a.6, entitled "Hearing; no evidence considered," reads, "Each party is

entitled to at least 14 days' notice of the hearing on the motion to dismiss. The court may, but is not required, to conduct an oral hearing on the motion. Except as required by 91a.7, the court may not consider evidence in ruling on the motion and must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits permitted by Rule 59." And obviously, 91a.7 is entitled "Award of costs and attorneys' fees."

One other item I should mention in connection with Dr. Lau's motion, there obviously was a flurry of repleading subsequent to the filing of the motion to dismiss, and so I again just reference that Rule 91 has specific language related to amendments and repleading as well, which the Court takes into consideration.

So with that, I'll hear from counsel for Dr. Lau on the MTD.

MS. LOSCANO: Thank you, Your Honor. My name is Julie Loscano.

THE COURT: You're going to have to pull that microphone a heck of a lot closer to you.

MS. LOSCANO: Is this good?

THE COURT: Yes.

MS. LOSCANO: So the State's SB 14 claims

with regard to Patients 6 through 21 and all of their DTPA claims have no basis in the law. This is not a question of whether we're considering evidence or not. It's about the allegations the State has pled. And because they have not met all the statutory requirements for the pleadings, as a matter of law, they must be dismissed.

Turning first to SB 14's claims as to Patients 6 through 21, the effective day of SB 14 is September 1st, 2023. This isn't disputed. It shows up in the State's petition. SB 14 does not apply to conduct before this date. Nothing in the statute says that it can be applied retroactively, and Texas law has a presumption against interpreting a statute to apply it retroactively in the absence of that statute providing otherwise. Nonetheless, for 16 of the patients, the State has only alleged acts from Dr. Lau that occurred before the effective date, and this is, as you referred to, the prescriptions.

So what is the conduct that we're talking about. I may provide this. It's just the statutory language that I'll be talking about.

THE COURT: Okay. Have you provided a copy to opposing counsel?

MS. LOSCANO: I will do that now.

THE COURT: Thank you.

MS. LOSCANO: So if you turn to the second page, you will see the text of what SB 14 prohibits with regard to the conduct alleged in this case. So that's providing, prescribing, administering, or dispensing certain medications in certain circumstances. Note, however, that SB 14 does not prohibit all treatment for patients with gender dysphoria. It's very clear that it's concerned with these discrete texts. But the State has only alleged the prescription of medication, and that is a complete act. It was completed before the effective date. It's not something that is carried over.

In order to still target these discrete acts and take them within the gambit of the statute, the State has invented a course of treatment concept, but this has no support in the law. SB 14 doesn't use this language. It doesn't refer to treatment. So whether writing a prescription is part of some sort of continuing course of treatment is irrelevant. That's not what SB 14 is prohibiting. Therefore, these acts as pertaining to Dr. Lau were completed before the effective date and they cannot be the basis of claims brought under SB 14.

Now turning to the DTPA claims. If you

turn to the next page in the slide deck, you'll see the text of section 1746(b)(24), this is the failure to disclosure claim. You can see that it requires four separate elements, the first being that Dr. Lau failed to disclose material information; second, that Dr. Lau was aware of this at the time of the transaction; third, that Dr. Lau intended to induce a consumer into a transaction by so doing so; and four, that the consumer would not have entered that transaction if such information had been disclosed.

Here, the State has failed to allege elements three and four. As an initial matter, also as you referenced earlier, the State has not identified a consumer. Consumer is a defined term under the DTPA. If you flip to the next page of the presentation, we have that definition there. You can see it requires a party to seek or acquire goods or services. And the State claims, without explaining, that insurance companies and pharmacies are consumers but they do not plead any facts to support that. Instead, it's really -- it's the patients that are seeking and acquiring Dr. Lau's medical services. So they are the consumers for the purposes of the statute.

Specifically regarding element three, the State has not alleged the requisite intent. They

haven't alleged that Dr. Lau intended to induce any of her patients into accepting her services through any sort of purported failure to disclose. And given that the purported failure to disclose here is the allegedly falsified billing records, they don't explain how that would induce the patients to obtain medical services given that, one, patients don't really usually see billing records, it's kind of a back-end thing; and two, that billing records are created after the fact to reflect services that were provided. So the timing of intending to induce doesn't quite line up.

They also haven't alleged element four, which is the requisite but for circumstances. There's no allegation that the patients would not have obtained these medical services if these billing records had somehow been disclosed to them.

Finally, even under the State's incorrect interpretation of consumer, which is far broader than the statute allows, the State hasn't alleged the insurance companies or the pharmacies would not have provided this coverage for medication if that information had been disclosed.

Turning to the second DTPA claim, which if you can flip to the next slide, we have the text there. This is 17.46(b)(5) regarding material misrepresentation

of fact. This kind of has two clauses to it. One would be representations regarding goods or services, that they have qualities that they don't actually have. The second is representations regarding a person, that they have qualities that they don't actually have.

With regard to the first clause, the State has failed to allege that Dr. Lau made any sort of material misrepresentations regarding her services to her patients, that is, the consumer. This clause does not refer to consumer on its face, but Texas law states that this clause was intended to protect consumers, and therefore, the State's allegations regarding allegedly falsified billing records provided to pharmacies or insurance companies don't constitute misrepresentation for the purpose of this part of the statute. And additionally, the State hasn't alleged that Dr. Lau has made any sort of misrepresentations regarding her qualifications.

So because the State hasn't met the minimum requirements for the pleading under the DTPA, these claims must be dismissed.

And finally, there's just one additional reason to bar the State's DTPA claims from monetary relief, and that is the professional services exemption. This is the last page of the deck I provided. It's

pretty straightforward. It's right there in the name. Dr. Lau is a doctor. She's a medical professional providing medical services within the context of her expertise and she is therefore exempt from damages in this case.

Thank you, Your Honor.

THE COURT: Thank you. State, your response.

MS. SMITH: Thank you. So as an initial matter, as counsel for Dr. Lau stated, even if they win this whole motion to dismiss, this case is still going to be live because it does not apply to the SB 14 claims for Patients 1 through 5 and 22, just as a reminder.

Next, I would like to point out that all of these arguments are affirmative defenses that were not raised in Defendant's answer that was filed within the 60-day window to file the Rule 91a motion, so therefore, they are not properly before the Court on a Rule 91a motion to dismiss which is limited to the pleadings.

On the issue of retroactivity, again, I think we go through this in our pleadings so I'm sure you're aware. But first, retroactivity is, in fact, an affirmative defense because, under the State of Texas, an affirmative defense is any matter of confession and avoidance. AKA, it's something that isn't saying, no, I

didn't do it but rather seeking to avoid liability based on an independent reason. That's what they're saying, that timing was different, it doesn't apply retroactively, so that is an affirmative defense.

Retroactive laws are only unconstitutional if they impair vested rights. That's under the case *General Dynamics Corp. v. Sharp*, cited in our briefing, and per section 151.003 of the Texas Occupations Code, quote, the practice of medicine is a privilege and not a right of individuals. So this practice is not even within the universe of rights that are protected by the retroactive clause in the constitution.

Preenactment conduct can be held accountable even where it -- even where something is subject to the retroactivity clause. Preenactment conduct can be held accountable so long as the events were not completed before enactment. That's a quote from *Quick v. City of Austin*, a Supreme Court Texas case.

Opposing counsel argues that the prescription was a complete act. We disagree. If you look at the prescriptions that were issued to these patients, several were written the day before or two days prior to the enactment of SB 14, and they were for 84 days or they were with refills, and those necessarily

could not have been completed prior to the enactment date.

Furthermore, as alluded in our briefing -- and furthermore, in our petition we did not just allege prescription. We alleged providing, prescribing, administering, and dispensing, and under the continuing -- continuous course of treatment, even after the date of enactment, even after the day the prescription was written, the doctors were still administering these prescriptions. And to clarify, these are not oral medications, these are injections. They are highly regulated controlled substances. And so, as the case law that's cited in our briefing demonstrates, those kinds of drugs are under the continued administered care of the prescribing physician, particularly when they are having subsequent treatment visits for those things.

So I'll turn to the DTPA. There's been multiple claims that a consumer must be an individual. That is not correct. Section 17 -- under the definition section of the DTPA, I believe it's 17.45. Yeah, so under 17.45, a consumer is not just an individual; it can also be a corporation, and that can include an insurance corporation. Now, there are certain kinds of corporations that do not qualify under this definition,

but there are no facts in the record -- or in the pleadings right now about what would be -- what would qualify for that. So that's going to be an issue for discovery. Not appropriate on a Rule 91a motion.

And next, I will address that in Texas we have a fair notice pleading standard. And so that under Texas Rule of Civil Procedure 47, an original pleading must set forth, subsection A, a short statement of the cause of action sufficient to give fair notice of the claim involved. This is not a federal standard. This is not a 12(b)(6) motion in federal court. This is a fair notice pleading. And certainly the allegations here were sufficient to give the fair notice of the DTPA claim.

Finally, I'll note on the professional services exemption, that's under DTPA section 17.49(c). So that clause expressly only applies to a claim for damages. There are many discussions in the DTPA about claims for penalties, but here it expressly said damages. So it is not including damages and penalties here. The DTPA refers to them separately throughout. The drafters knew what they were talking about. The professional services exemption only applies to a claim for damages, which this is not. This is a suit for penalties and some fees.

Next, even if it did apply, it only applies to professional service the essence of which is the providing of advice, judgment, opinion or similar professional skill. So it's as if a lawyer -- you know, a lawyer is giving legal advice and they work on something for ten hours and they're doing legal research. That is legal advice, professional advice, that would be covered by this. But then if the -- if the lawyer then says that instead of 10 hours, they billed 20 hours and they lie on their record to their client, that is not professional advice. Under subsection 1, that is an express misrepresentation of a material fact that is not protected by this exemption.

Similarly, when Dr. Lau is giving treatment, talking to doctors, if this were a claim for damages, the professional services exemption may apply, but it does not apply to lying or fraudulent billing practices. Thank you.

THE COURT: Thank you. Any final points, Counsel?

MS. LOSCANO: Yes, I would like to respond starting with the affirmative defenses point that the State raised. While initially the affirmative defenses were not in our answer, we did amend to include them, but we do not agree that they require to be pled within

our answer. State law says, and this is *Bethel v. Quilling*, that if they are adequately contained within the petition, they can be considered by the court.

Our argument on retroactivity is not an affirmative defense because it is not admitting that the actions were taken. It's not -- sorry. It's not a constitutional defense. It's a matter of statutory interpretation. We're saying that the statute cannot be interpreted to apply to conduct before, not arguing that it's a matter of a timing as to whether or not it is a defense. So the vested rights argument is inconsequential to that.

With regard to the conversation around completed events, SB 14 is very clear in the way that it talks about the actions that it prohibits. It says prescribing or administering or something else. Administering -- first of all, Dr. Lau didn't do these things. She didn't hand out prescriptions. She didn't inject the patients. These are all actions undertaken by third parties.

In addition, prescribing is not inclusive of these other things; it is one particular act. Any sort of refill is a separate action, any sort of injection is a separate action, and SB 14 did not prohibit the overall course of treatment which is an

idea that comes from a completely separate area of law that's not relevant here. It's about statutes of limitations under malpractice.

And I would actually like to refer the Court to a case called Rowntree which the State cites for this course of treatment idea. I can provide a copy that is highlighted.

THE COURT: Do you have a copy to provide to opposing?

MS. SMITH: We have Rowntree.

THE COURT: Do you have a copy with the highlights that she's referencing?

MS. SMITH: I do not.

THE COURT: Do you want a copy with the highlights so that you are able to quickly see the argument?

MS. SMITH: Sure.

MS. LOSCANO: So the State has referred to this case for the point that course of treatment is something that happens from when the drug is first prescribed and that the doctor has a continuing obligation to monitor the patient, to have refills. The idea is when does the statute of limitations run for medical malpractice claims.

However, I want to point you to this

paragraph where the court, after considering all of this, points out that the claims brought by the plaintiffs are not about a course of treatment. They don't allege that the course of treatment was the basis of the claims that they brought. The issue was that there was an exam. At the exam, the doctor missed something and the patient later, I believe she died due to not having that diagnosis at that date. So the court only looked to the date where the doctor actually acted as a basis for when the statute of limitations should run.

Similarly here, we're not dealing with any sort of allegations about course of treatment. We're dealing with allegations about specific acts, and therefore, we should be looking at the date of those acts when considering how they relate to the effective date of SB 14.

With regard to the DTPA, it does not say in the argument that a consumer can also be a corporation. The issue here is the relationship between the entity, whether that's an individual or a corporation, and the person providing the goods or services. The insurance companies, the pharmacies, they are not seeking or acquiring goods or services from Dr. Lau, and therefore, they are not consumers of Dr. Lau.

With regard to the fair notice pleading standard, while there is some flexibility within the case law, particularly with less sophisticated plaintiffs, the statute here very clearly lays out what the requirements are for these claims, and the defendant has the right to be on notice for how those claims will be satisfied.

With regard to the professional services exemption, there are cases in Texas law where they have interpreted damages to include civil penalties in order to preserve the intent of the law. Here, the professional services exemption is designed to prevent doctors, lawyers, whoever from being subject to liability for matters of discretion, and this is a matter of discretion. And to hold them liable for these kinds of issues would have a dampening effect on the industry and potentially insurance rates for medical insurance as well -- or for the doctor's side of things.

Finally, with regard to billing not being a professional service, we disagree. It's a key part of medical care, and the billing analogy to lawyers is inaccurate. A matter of hours billed is something that can be calculated with a stopwatch. The matter of how a patient's records are billed are not recorded. They don't serve the same function. They reflect the -- the

doctor's medical judgment in a way that hours recorded with a stopwatch do not reflect a lawyer's professional expertise. That is all.

THE COURT: Thank you. Counsel, final remarks.

MS. SMITH: Very brief. I would like to return to *Rowntree v. Hunsucker*. And so we talked a lot about what qualifies as a continuing course of treatment and so did *Rowntree*. 106, the court said, "The answer to questions of whether the patient receiving a course of treatment and when the course of treatment ends will depend upon the specific facts of the case." *Rowntree v. Hunsucker* talked about the facts because it was a summary judgment case. Right now we're on a Rule 91a. Continuing course of treatment is a factual issue that's appropriate for being resolved here. And that's all I have to say.

THE COURT: Thank you. On the record before the Court, Lau's motion to dismiss is denied. All right. The Court's entered an order to that effect. I have sent it to the clerk's office at this time to be docketed.

If I can go ahead and ask for us to turn to Dr. Cooper's MTD, and I'm just going to outline. In connection with Dr. Cooper's motion to dismiss, there is

obviously different arguments that are raised. Two of them that I want to hear from the parties on today in particular are the arguments related to the Texas Tort Claims Act and as well the argument related to sovereign immunity. And then one of the issues I need the parties to address, particularly in light of the information we learned from Children's today, that it appears that at least some of the treatment for all of the patients potentially was administered under the umbrella of Children's, who is not, obviously, a state run hospital and the impact on that on the arguments. I would like for both of y'all to address that particular piece in connection with -- and again, I'll just note that there was no joinder in these arguments by Dr. Lau, so they are only asserted as to Dr. Cooper. And with that, I'm going to turn this over to Counsel for Dr. Cooper. Thank you so much.

MS. CORBO: Thank you, Your Honor. Isabella McKinley Corbo for Dr. Cooper.

First I would just like to address the fact Your Honor acknowledged that the State filed an amended pleading this past Monday. They brought a new claim under Health and Safety Code section 481.071. That amended petition did not change the existing DTPA claim. It didn't add any factual allegations. So we consider

this motion to still be alive as to the DTPA claim, but Dr. Cooper reserves his right to seek dismissal of that new claim under Rule 91(a).

THE COURT: And so I'm just going to have us confirm --

MS. SMITH: That's fine. Yes, the State agrees.

THE COURT: The State appears to agree. I just wanted to get that on the record. Okay. Now you can go forward.

MS. CORBO: Thank you. We're here today on Dr. Cooper's motion to dismiss the State's DTPA claim, which should be dismissed in its entirety. And as Your Honor knows from our briefing, we have three arguments in our motion to dismiss, but I would like to begin with why the State's claim is barred by section 101.106(f) of the Texas Tort Claims Act, which is dispositive of the State's amended petition.

Now, this section is crystal clear. It tells us that if a lawsuit is brought against a government employee based on conduct within the scope of their employment, and if that suit could have been brought under the TTCA against their government employer, that it must be treated as a claim against that employee in their official capacity only. The

statute calls for a mandatory dismissal unless the plaintiff amends their pleadings to dismiss the employee and correctly name their government employer instead. The point of this statute is to quickly dispose of incorrectly filed suits. And the State claims that this analysis requires evidence outside the pleadings, but this is not true.

To the first prong, Dr. Cooper's status as a government employee is established in the first sentence of the first paragraph of the State's petition, which reads, "Defendant is M. Brett Cooper, M.D., an employee of the University of Texas Southwestern Medical Center in Dallas, Texas.

THE COURT: But can you address the second piece which is also pleaded, which is that he has privileges at Children's and what we now know, which frankly is a fact issue, that all of these patients got treatment while at Children's, or at least the bulk of them.

MS. CORBO: Yes, Your Honor. So the State also alleges that Dr. Cooper has hospital privileges at Children's. Hospital privileges are not the same thing as employment. So we should take these pleadings here as true. And furthermore, the State actually cites two cases that are on point here that dealt with similar

situations where a doctor who was an employee of UT Southwestern, just like Dr. Cooper, and who had hospital privileges at Children's, just like Dr. Cooper, was found to be a government employee for purposes of TTCA liability -- sorry, immunity -- even when the care at issue was given in the context of that doctor's hospital privileges at Children's. And those cases are *Powell v. Knipp* and *Skapek versus Perkins*. I believe it's versus Perkins. I know it's Skapek.

THE COURT: Yeah. They rely on Skapek pretty heavily. Okay.

MS. CORBO: So the State doesn't hedge here. I mean, we should just look at the plain language of paragraph 1. They say that Dr. Cooper is an employee of the University of Texas. They don't say that he might be an independent contractor or that he might have hospital privileges at UT. They say that he's an employee.

Now, to the second prong, Dr. Cooper's actions were clearly undertaken within the scope of his employment. The supreme court has established a broad standard here. The Court needs to only determine that there is a connection between the employee's job duties and the alleged tortious conduct. In fact, there's a case that we cite that's directly on point here. It

tells us that it doesn't matter for this analysis if Dr. Cooper is alleged to have acted unlawfully or even fraudulently. That's *Lenore versus Moreno* (phonetic).

And the court in that case found that a doctor who was alleged to have committed Medicaid billing fraud related to the care at issue was deemed to be acting within the scope of his employment for purposes of TTCA immunity because he was discharging the duties generally assigned to him. This is directly parallel to the conduct here, where Dr. Cooper is alleged to have violated the DTPA via his billing practices.

The State is claiming in paragraph 8 of their petition, they're alleging that all of their DTPA claims are based on Dr. Cooper's practice of medicine, so again, the facts that we need -- or sorry -- the points that we need to look at here are plain from the face of the pleadings.

THE COURT: Can you rewind just for a second again on this issue related to the employment piece. The cases that are cited by the State and that you relied upon as well, they're all summary judgment cases. They're not motion to dismiss cases. So, you know, that's the other question the Court has is, is this the proper time? Because all of the case law cited

by both parties is not in a motion to dismiss context, either a 91a or in a federal court in connection with their, you know, motion to dismiss standard. They're all summary judgment cases, which is a very different time frame in a case.

So why is it appropriate for this Court to grant dismissal at this stage versus saying, I think you've raised these issues prematurely and while you have the right to reraise them, now is just not the right time? Why is that not the answer here?

MS. CORBO: So, Your Honor, we do actually cite a number of cases that were on a motion to dismiss.

THE COURT: Cite me to those specifically, because the ones that I looked at were summary judgments.

MS. CORBO: So *Garza versus Harrison* is a supreme court case from 2019 that looked at this issue and that was decided on a motion to dismiss.

THE COURT: Okay. Give me the cite real quickly.

MS. CORBO: Okay, one sec.

MS. SMITH: I have it.

MS. CORBO: I have it as well, thank you. It's 574 S.W.3d 389.

THE COURT: Tell me the last numbers again,

please.

MS. CORBO: 389.

THE COURT: All right.

All right, Counsel, you may continue.

MS. CORBO: I can point to several other cases that were decided on a motion to dismiss if Your Honor would like.

THE COURT: This *Garza v. Harrison* is not in the context of the question I am asking, though, which is about whether or not -- or it doesn't appear to be -- the issue related to employment. So, yeah, it's an MTD case, but it's not an MTD case on what I'm asking you if it's a fact question.

So do you have any cases that deal with the question I'm asking, which is, is the argument you're making related to the Texas Tort Claims Act and sovereign immunity premature because of the issues surrounding employment? And I don't see any cases whatsoever cited by either side that come before summary judgment and after discovery on that issue. And the Rule 91a is obviously no evidence. And so that is my question to you.

That's the question I really have for Dr. Cooper on this -- on these arguments is, is now the right time? Not are these proper arguments, but is now

the right time? And that's what I want you to respond to. Is there any authority that says, yes, we have dismissed on a Rule 91a or at the dismissal stage; or, no, Judge, what really should happen is you should consider these arguments and we might prevail or might not at the summary judgment stage?

MS. CORBO: I cannot point to any authority along the lines that you're describing. However, we think, again, that these -- that the facts that we need to prove here are clear from the face of the pleadings. We don't think that we need extrinsic evidence. However, we are happy to provide Dr. Cooper's employment agreements with UT, and we're happy to go discuss those with the State right now if you would like, and we can maybe come to an agreement on this issue today.

THE COURT: And when you say come to an agreement on this issue, what do you mean?

MS. CORBO: I mean that we have Dr. Cooper's employment agreements with UT that we believe clearly demonstrate that he is an employee of the University of Texas. So perhaps if the State has a chance to review those agreements with us, they would concede that he is indeed an employee of UT.

THE COURT: But I think that's evidence. That's really what I'm driving at. Rule 91a is no

evidence, no discovery, pleadings only. If I have to look at the employment agreement, if I have to look at the individual patients, that's evidence. That's discovery. And that's all I'm trying to drive at. It is not -- not do you have arguments that the Court should consider, but are you bringing them to this Court prematurely? And that's what I'd like for you to -- if you're saying, hey, let's show them the employment agreement, then I have to say, no, I've got to deny the motion to dismiss, and what you need to file is a summary judgment because that's what Texas law would require. And that's what I'm trying to drill down to.

MS. CORBO: So we, again, don't believe that you do need to look at the evidence here, Your Honor. We think that the State's language in the first paragraph of their petition where they clearly delineate between Dr. Cooper being an employee of UT Southwestern and having hospital privileges at Children's means that he was an employee of UT. And again, there are the cases that I found that doesn't -- the difference between the two of those things doesn't matter for purposes of whether or not an individual is a State employee. So we think that this is clear from the pleadings.

THE COURT: Thank you, Counsel. You may

proceed.

MS. CORBO: So thirdly, the DTPA claim could have been brought under the TTCA against UT Southwestern. And now, the State does not dispute this in their opposition, so we consider this prong of the analysis unopposed. But just to explain, the supreme court has held that any tort claim that is brought against a government unit is brought under the Tort Claims Act for purposes of section 101.106. And this is true of both common law and statutory torts. And Texas courts have recognized that DTPA claims are torts and have dismissed them under section 101.106(f). Which brings me to my -- so even if the State -- pardon me.

So under the TTCA, this lawsuit is only proper against Dr. Cooper in his official capacity and must be dismissed unless the State files amended pleadings naming UT as the proper defendant. But even if the State were to refile naming UT Southwestern as the defendant, doing so would be fruitless since UT Southwestern has sovereign immunity, and we think that this is a basis for you to grant our motion to dismiss without leave to amend.

Now, the sovereign immunity doctrine is very familiar. It protects state institutions, including the University of Texas and its hospitals,

from being sued without their express consent. The DTPA does not waive sovereign immunity, so UT Southwestern cannot be sued.

Finally, the DTPA claim also fails on its face for two distinct reasons. First, like counsel for Dr. Lau explained, the DTPA contains a professional services exemption that protects doctors from liability based on their providing of medical advice or judgment. This inquiry looks at whether a professional's actions can be characterized as advice, judgement, or opinion. And courts have held that the administration of medication and the diagnosis of a patient require the exercise of trained medical judgment.

Now, in order to bill insurance for any prescriptions, a physician must first make a professional judgment about the appropriate diagnosis and medication for that patient. So Dr. Cooper's behavior that is at issue here with respect to the DTPA claims can be characterized as rendering professional judgment.

Secondly, the State's petition falls short of the certainty that is required in suits seeking statutory penalties. So here the State is asking the Court to make several inferential leaps. They don't actually plead that any of the patients in the petition

did not have the diagnoses that Dr. Cooper allegedly used for their medication, or they also didn't plead that using -- if a patient did have a dual diagnosis of, for example, endocrine disorder or gender dysphoria, that using one billing code over another would have been a DTPA violation.

For these reasons, we respectfully ask that you grant our motion to dismiss.

THE COURT: Thank you. And, Counsel, I'll hear from y'all in response at this time.

MS. SMITH: And I'm planning to just focus on the TTCA and sovereign immunity, like you mentioned, but if you have questions on anything else, I'm happy to address those.

So under TTCA section 101.106(f), there are several requirements in order to get dismissal -- get a case dismissed against a government employee under here. One of those is that it must -- that the employer must have the legal right to control the employee when they are doing that act. So, yes, the petition states that Dr. Cooper was an employee of UT Southwestern. It does not state whether UT Southwestern had the legal right to control what he was doing with regard to the patients here. And as you referenced, clearly many of these activities were taking place offsite, not at UT

Southwestern. They were taking place at Children's Health, which is not a government employee. As of right now, we have no idea what Dr. Cooper's employee relationship is with Children's, with UT Southwestern. That is a fact issue. The very fact that we're offering to review employment agreements shows that this is a fact issue that is necessarily going to need to go outside the pleadings. Hospital employment is very complicated. There are a lot of people that work there under a lot of different agreements, and that's not something that can resolved under Rule 91a.

I will also note that under *Skapek*, the TTCA was suggesting that the employee -- so there has been no mention up until this point that UT Southwestern should be a proper party here. They were not disclosed as a potential party in the initial mandatory disclosures. There has been no motion practice to try and substitute them here.

So unless the Court has questions about the TTCA, I'll turn to sovereign immunity.

So it is very premature to be discussing sovereign immunity today because UT Southwestern is not a party to this case. All of Dr. Cooper's arguments about sovereign immunity pertain to UT Southwestern. But again, there has been no motion to substitute them

here, and counsel has not appeared for UT Southwestern, so it's not really relevant. Dr. Cooper himself was not sued in his official capacity. He was sued in his individual capacity. And there are several indications of that. So there's a case cited in our briefing, *GTECH Corp. versus Steele*, which is how can you tell if someone is sued in their official or their personal capacity. It does say in that case that the initial burden is on the government employee seeking to assert that, so the initial burden is on Dr. Cooper. And again, anything that needs to be proved is necessarily not going to be appropriate for Rule 91a. Factors that are considered under that case, would relief require funds from the public treasury or control state action. None of the relief sought here is asking for money from UT Southwestern, nor would it control the actions of UT Southwestern.

Finally, you know that this was a suit against Dr. Cooper in his individual and not official capacity because had we sued Dr. Cooper in his official capacity, we would have said that he was acting ultravirus, and sovereign immunity does not bar claims alleging that a government official acted ultravirus. Under *Hughs v. Dikeman* cited in our briefing, a government official acts ultravirus whenever he fails to

comply with a statute. We have alleged that he has failed to comply with several.

THE COURT: What's the State's understanding of what constitutes official capacity? I mean, basically, your argument is, Judge, we feel like we want to go forward in his individual capacity, so that's what we're going to call it. I mean, isn't official capacity so long as they are operating in the course and scope of their employment with the governmental entity? So again, coming back to the issue that I keep asking about, we have to decide this employment piece.

MS. SMITH: Yes.

THE COURT: If he is acting in the course and scope of his employment, is that not thereby his official capacity?

MS. SMITH: Well, as we mentioned, I think at this point that's a fact issue that hasn't yet been addressed. And under this *GTECH Corp. v. Steele* case, there are perhaps some facts that might show he's acting in his official capacity. We are not seeking to sue him in his official capacity, but that --

THE COURT: Whether you're seeking to sue or not, you don't get to just say, I characterize it as individual capacity, so therefore it is.

MS. SMITH: Yes, understood. As the State, we get sued in our official capacity often, so very familiar with that. But there are factual determinations that relate to this, such as funds from public treasury, controlling State action; those are all fact issues that are not appropriate right now.

. So like the TTCA, perhaps an assertion of sovereign immunity will become appropriate throughout the discovery phase of this case, but right now, under Rule 91a, we are not there. Thank you.

THE COURT: Anything further?

MS. SMITH: No, thank you.

THE COURT: Counsel, any final points?

MS. CORBO: Yes, Your Honor. So first, we understand that Dr. Cooper was sued in his individual capacity. What we are saying is that that is incorrect under the TTCA, that they needed to bring the suit against Dr. Cooper in his official capacity only.

Secondly, we don't think that there is any need for us to file a motion to substitute. Under the TTCA, that statute, so 101.106(f), does not contemplate the plaintiff -- sorry -- the defendant employee filing a motion to substitute. What it says is, "On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended

pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed." So this statute only contemplates the plaintiff substituting a party, not the defendant, and we don't think that we had a duty to disclose UT as a potential party because, again, they would be -- they would have sovereign immunity in this case.

Thirdly, I would just point to -- so the State said that Dr. Cooper -- that they're not alleging that Dr. Cooper is an employee, and that employee doesn't include someone who might be an independent contractor or someone who the government unit that they're employed by doesn't have the legal right to control the tasks of.

And I would point to the definition of employee under the TTCA which the State cited in its briefing, which says that an employee is a person who is in the paid service of a governmental unit but does not include an independent contractor, an agent of an independent contractor, or a person who performs tasks, the details of which the governmental unit does not have the legal right to control.

So again, by the word "employee" in the fist paragraph of their petition, the State is saying

that Dr. Cooper is not an independent contractor of UT and that UT does not not have the legal right to control his work based on the exclusion in the definition.

THE COURT: I don't think I agree with that particular argument given the fact that they've also alleged that he has privileges. And so one of the cases you already cited was *Skapek*, and then *Skapek* is cited by a number of other authorities, one of them being *Stallworth*, which is 2021 Westlaw 5496345, which is at the MTD stage, not a Rule 91a but just at a motion to dismiss. And the case kind of goes through not identical factual allegations but similar to here, where services were provided at a nongovernmental unit. And the query became, well, who had control, the legal right to control the treatment that was being provided. And that court ultimately concluded that a motion to dismiss could not or should not be granted given, in part, the fact issues.

And so, again, I just want to come back to -- I mean, you just cited the definition to me. Do you agree that at present, we don't know who had the legal right to control all of the treatment and services that were provided for each of these patients, or do you disagree with that?

MS. CORBO: I think that we just need to

focus on the word "employee" in the first paragraph of the State's petition.

THE COURT: All right. So at present, then, the Court similarly denies Dr. Cooper's motion to dismiss. In doing so, I want to be abundantly clear as it relates to the TTCA and the sovereign immunity. I think the arguments y'all have raised require the Court to consider evidence. I just think that's where we're at. And so while I don't think they're properly raised in a 91a context, I am simply denying them as premature because the Court has to consider evidence.

Are there any questions whatsoever regarding the Court's ruling related to the TTCA and the sovereign immunity arguments, Counsel for Dr. Cooper?

MS. CORBO: No, Your Honor.

THE COURT: Counsel for --

MS. SMITH: No, Your Honor.

THE COURT: All right. Because I think that we need to make the clarification in the order, I was able with Dr. Lau's, which doesn't contain those arguments, just to sign a simple order that says Rule 91a is denied, and I sent that on to the clerk's office. Because I think Dr. Cooper's order needs to be more nuanced, I'm going to ask you to prepare a draft, provide it to opposing counsel, and then get it to me to

sign because I want it to be clear from its face that I'm finding that it's premature for the Court to consider the TTCA and the sovereign immunity arguments. Okay? Anybody have any questions about that?

MS. SMITH: No.

THE COURT: I would encourage everybody, some of the cases that are on this topic talk as well about what the relevant discovery is. So, for example, you know, the billing records are relevant, who actually paid -- who received the payment for the treatment, was it UT Southwestern, was it Children's, and so I would say some of these cases are likely very helpful for the parties to be able to tailor, in addition to the employment agreement. I don't think that's the sum total of what courts have looked to on the legal right to control, and so y'all might drill down on those cases so that you can ascertain and perhaps, again, since we've been discussing discovery issues today, whether or not there is a way for us to get in this roll one the copy of the employment agreement, billing records related to the treatment, and who received payment. And again, I think that's in your -- both parties' best interest, so y'all might want to kind of drill down on that piece.

MS. CORBO: Your Honor, just to clarify,

are you denying Dr. Cooper's motion on the basis of our other arguments as well?

THE COURT: I am denying it in total, and I'm specifically noting that, as it relates to the TTCA and the sovereign immunity, that the Court's basis for denial on those is I'm simply finding it premature, okay.

MS. CORBO: Okay.

THE COURT: So I think that answers your question.

MS. CORBO: It does.

THE COURT: Okay. We're going to go ahead and stand in recess just for a second.

MS. HOLLAND: Your Honor, just one quick thing. Regarding the new claims in the amended petition, we would also like to reserve the right to --

THE COURT: I think y'all both have reserved the right. And frankly, I don't think I could find that you waived it given when they were -- the amended pleading was filed. You're still within your time frame. I'm not finding any waiver whatsoever.

MS. CORBO: Thank you, Your Honor.

THE COURT: Absolutely. Okay. We're off the record.

(Recess taken)

THE COURT: All right, everybody. We are back on the record. We've been working really hard to try and get some agreements related to discovery. I think we have reached some limited agreements.

As it relates to the motion to transfer venue discovery, all counsel of record are in agreement the documents, following the Court's in camera review, are going to be produced ten days from today's date. And just to be abundantly clear, ten days from today's date is on March the 10th. Okay.

If there is no -- no in camera review related to those, then it's, hey, on March the 10th, those docs are going out to everyone on the motion to transfer venue. The Court's already reviewed the test set, as has counsel for the nonparty patients. We feel imminently comfortable we are protecting the identity and we're redacting all the right things. Those records are going on the 10th.

As well, we are before the Court here today related to remaining discovery. The Court has been trying to work very hard with the parties to try and see if we can limit an initial production set to roll one. At present there is an agreement between the State and Defendants Cooper and Lau related to roll one for the unrepresented patients.

As it relates to those persons, Children's Medical and the University of Texas Southwestern Medical Center will prepare for production, with appropriate redactions to preserve protected health information, including patient identity, the medical, laboratory, billing, and prescriptions records for the care and treatment of Dr. Cooper or Lau provided or ordered for the unrepresented patients relating to testosterone or puberty blockers from January 1, 2022, through the present. Children's has been requested to produce those documents with all due haste. They have advised that they can produce and will produce on a rolling basis. Children's remind me, was -- for the total of the production you were saying you need 21 days but you would begin rolling immediately as soon as -- upon having the patient file; is that correct?

MS. COOPER: Yes, Your Honor.

THE COURT: Okay. So that will be the time frame.

Upon that, again, the unrepresented patients, those records will be provided to the Court and as well to counsel. The Court will receive both the redacted and the wholly unredacted so it can evaluate the redaction for those unrepresented patients.

As it relates to the represented patients,

we haven't been able to reach an agreement regarding the standard applicable to the ultimate review, and the Court has expressed I feel somewhat hands tied behind my back because we have kind of generic examples that are not tied to specific records. And so the Court's proposal was for us to get the production, get the in camera into the Court's hands, and then argue about the standard, and that makes counsel for the nonpatients uncomfortable.

So at present, we're here today in connection with the nonparties' objections. The Court denies -- or sorry -- Children's Health objections and as well nonparties. The Court denies the objections to the extent I order production to go forward on roll one as I've already stated as it relates to the unrepresented patients.

As it relates to the represented patients, I order Children's Medical and UT Southwestern to prepare those documents as well in the category I've already stated for production. Following production, those records shall again be provided to the Court in redacted and unredacted form and similarly will be provided to counsel for the parties -- and by parties, I mean patients. So sorry, I misspoke -- counsel for the patients in redacted and unredacted form so you can do a

comparison of the records.

Because there are other hearings and other issues at play, I have asked Children's and UT Southwestern to make all best efforts to ensure that those records are produced on or before March the 11th. There is a hearing contemplated in connection with Dallas.

State, I understand you're not waiving any immunity or other arguments, but you said, hey, we don't think we have to appear in Dallas. Nonparty patients disagree. And so just for purposes of that, so that everybody can hopefully avoid a disagreement, we'd like the opportunity to review those records and see if upon looking at them, Judge, whatever the standard is that you believe is applicable, we think we're in a good spot to protect our patients while releasing the records as Children's and UT Southwestern has redacted.

Okay. Anybody have any questions regarding the Court's order? I'm going to start with the State. Do you have any questions?

MR. FARQUHARSON: No, Judge.

THE COURT: Okay. Dr. Lau, Dr. Cooper, any questions?

MS. PACKMAN: No, Your Honor.

MR. LEGG: No questions, Your Honor.

THE COURT: Children's Health, you have one?

MS. COOPER: I just have one clarification, Your Honor.

THE COURT: Yes.

MS. COOPER: Your order with respect to the unrepresented patients that the records -- redacted records be provided to the parties, did you mean counsel for Drs. Cooper and Lau?

THE COURT: I do.

MS. COOPER: Not to the State at that point; correct?

THE COURT: No, to the State as well because they're the -- oh, because of the privilege, yes. No, no, I'm sorry. Y'all are giving me panicked looks. No, in compliance -- I'm sorry. We're talking about so many different paths at this point in time.

No, they have to have the opportunity for the review to assert the privilege on their behalf, and so, yes, just to counsel for Drs. Cooper and Lau. I apologize. But that, again, is applicable only to the patient records. We've been talking about Dr. Lau's discovery, nonpatient stuff, that needs to get produced, Dr. Lau.

Okay. So with that clarification, State,

do you have an additional clarification?

MR. FARQUHARSON: I was just going to say, and the same process applies for the review and redaction?

THE COURT: Correct, yes.

Okay. Any questions by you as it relates to the Court's rulings?

MR. LOGAN: Your Honor, and I may have missed it, I'm really sorry, but I believe the Court was going to rule at least partially on the motion for partial stay of the production.

THE COURT: Okay. So --

MR. FARQUHARSON: And, Judge --

THE COURT: I think the State has objected to say that the motion was untimely because of the timing set. And so it's not set for hearing today, and so the Court's ruling is not on the actual motion but it's fairly -- I'm not ordering any production at this time other than what is contemplated by roll one. And to that end, the State has agreed to defer the remaining issues on the Lau motion to compel as it relates to the patient records until after roll one's production is completed. They have reserved the right, they're going to be setting a further hearing for us to come back and talk about all of the other issues that they raised in

connection with the patient records once this roll one is completed.

And, State, have I accurately stated your position, or did I misstate something?

MR. FARQUHARSON: I think you accurately stated our position. What I was speaking to Mr. Stone about is whether or not we ever readdressed the motion to compel issues with Dr. Lau.

THE COURT: We addressed RFP No. 27. And then the other category for y'all was the patient records. RFPs 1 through 21 that we talked about at the hearing that we are trying to address right now, my understanding is that based upon the Court's clarifications and guidance regarding timing, that y'all were asking to have further conference with them and determine whether or not additional issues. The Court is very clear that there other documents at play with Dr. Lau beyond, but I guess I understood from our prior conversations that other than RFP 27, y'all thought you could make headway based upon the guidance I had given you.

MR. FARQUHARSON: Yes, except I thought that we had gotten clarification that there must be a good faith basis at the time the objection is made and that they must state --

THE COURT: I've ordered them to amend in connection with the production on the RFPs, and I think we left the issue on the rogs and the RFAs.

MR. FARQUHARSON: That's our understanding.

THE COURT: Okay. So do you think that clarifies everything you need? So we're deferring our remaining compel piece for right now until everybody gets roll one in their hands. Then y'all are going to come back and say, okay, Judge, now we're ready to talk after evaluating about all our remaining objections if there are any once you get the amended responses and the production.

MR. FARQUHARSON: And that they state the extent to which documents are being withheld pursuant to objections to --

THE COURT: They've already agreed to do that. I'm saying we're not doing hypothetical. If you've got a document and an objection applies, that's when we're asserting it.

MR. FARQUHARSON: That's our understanding.

THE COURT: All right. Hold on two seconds.

Children's, anything further from y'all?

MR. SUTKER: No.

THE COURT: Okay. Dr. Cooper, anything

further from y'all?

MS. CORBO: No, Your Honor.

THE COURT: Okay. Lau, anything further from y'all?

MR. LEGG: Nothing further, Your Honor.

THE COURT: Okay. And then last but certainly not least?

MR. LOGAN: Your Honor, we also still have our pending motion for protection in this court. Not just as to the RFPs, there's also interrogatories, RFAs. So we would just ask if the Court is carrying that over, if -- if it's still pending, that no action will be taken on those until our motion for protection is heard.

THE COURT: Well, save and except I have ruled as it relates to RFP 27, I've ruled on 1 through 21 to the extent I'm ordering production under the MTD and roll one. So to the extent that I'm ordering production, I'm overruling your request for protection or objections. Any remaining items are being carried. And so as a result, I would also be carrying any objections, with the concept being that the parties are going to try and talk to each other once we get roll one out the door.

Okay. Does that address your concern?

MR. LOGAN: Yes, Your Honor, it does.

THE COURT: Okay. Anything else that we need to talk about? I know we need those orders. But other than that, is there anything else we need to talk about? No, okay. We're going to be off the record.

(Discussion off the record)

THE COURT: We're back on. We did not reach the publicity order. As a result, we are going to have to reset. And so I will just ask for the parties, you can talk with Ms. Patterson right now and find a time. I would also say, just given all the multitude of other issues, probably not a bad idea for us just to all pick another time that we're coming back in any event, because what we don't want to have to do is herd kittens in connection with all the issues that we know are about to come to a head. Okay?

All right. Thank you, everyone.

(Proceedings concluded)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF COLLIN )

    I, Ashley Boyd, Official Court Reporter in and for the 493rd District Court of Collin County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

    I further certify that the total cost for the preparation of this expedited Reporter's Record is $220.00 and was paid by WINSTON & STRAWN, LLP.

    WITNESS MY OFFICIAL HAND this the 11th day of March, 2025.


                    /s/ Ashley Boyd
                    Ashley Boyd, Texas CSR 11998
                    Expiration Date: 09/30/2025
                    Official Court Reporter
                    493rd District Court
                    2100 Bloomdale Road
                    Collin County, Texas
                    McKinney, Texas

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sarah Shelby on behalf of William Logan
Bar No. 24106214
SShelby@winston.com
Envelope ID: 98562910
Filing Code Description: Other Document
Filing Description: Reply in Support of Appellees' Emergency Motion to Stay Discovery Pending Interlocutory Appeal
Status as of 3/18/2025 8:27 AM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David G. Shatto | | david.shatto@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
| Rob Farquharson | | rob.farquharson@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
| Ian Bergstrom | | Ian.Bergstrom@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
| Christopher Molak | | christopher.molak@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
| Amy Pletscher | | amy.pletscher@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |

Associated Case Party: Nonparty Patient No. 1

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Logan | 24106214 | wlogan@winston.com | 3/18/2025 8:22:23 AM | SENT |
| Evan Lewis | 24116670 | edlewis@winston.com | 3/18/2025 8:22:23 AM | SENT |
| Jervonne Newsome | 24094869 | jnewsome@winston.com | 3/18/2025 8:22:23 AM | SENT |
| Thanh Nguyen | | tdnguyen@winston.com | 3/18/2025 8:22:23 AM | SENT |
| Olivia Wogon | | owogon@winston.com | 3/18/2025 8:22:23 AM | SENT |
| Jonathan Hung | | JOHung@winston.com | 3/18/2025 8:22:23 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Walsh | 791874 | dwalsh@katxlaw.com | 3/18/2025 8:22:23 AM | SENT |
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sarah Shelby on behalf of William Logan
Bar No. 24106214
SShelby@winston.com
Envelope ID: 98562910
Filing Code Description: Other Document
Filing Description: Reply in Support of Appellees' Emergency Motion to Stay Discovery Pending Interlocutory Appeal
Status as of 3/18/2025 8:27 AM CST

Case Contacts

| Pauline Sisson | | pauline.sisson@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
|---|---|---|---|---|
| David Phillips | | DPhillips@winston.com | 3/18/2025 8:22:23 AM | SENT |
| Emily Samuels | | emily.samuels@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
| Melinda Pate | | melinda.pate@oag.texas.gov | 3/18/2025 8:22:23 AM | SENT |
| Jamie Vargo | | JVargo@winston.com | 3/18/2025 8:22:23 AM | SENT |
| Houston Docket | | ecf_houston@winston.com | 3/18/2025 8:22:23 AM | SENT |